STATE OF NORTH CAROLINA v. RICKY CLYDE TODD

No. 523A83

(Filed 27 February 1985)

**1. Criminal Law § 86.10 — accomplice's testimony — corroboration present — not required**

In a prosecution for felonious breaking and entering, larceny, and being an habitual offender, there was no error in admitting an accomplice's testimony which implicated defendant. The testimony was supported by evidence that defendant on the day after the theft had been within six feet of the briar patch where the stolen items were hidden and by scratches on defendant's arms; moreover, the unsupported testimony of an accomplice is sufficient to sustain a conviction if it satisfies a jury beyond a reasonable doubt.

**2. Criminal Law § 75.9 — defendant's voluntary statement to officer — no Miranda warning — no error**

There was no error in the admission of statements made to an officer without Miranda warnings where defendant called to the officer from his cell while the officer was putting gas in his patrol car. Both the circumstances surrounding the statement and the substance of the statement are clear indications that it was volunteered and a product of defendant's effort to enlist the assistance of the officer in a plea bargain.

**3. Burglary and Unlawful Breakings § 5.8 — breaking, entering, and larceny — evidence sufficient**

There was no error in denying defendant's motion to dismiss breaking and entering and larceny charges and no abuse of discretion in denying defendant's motion to set aside the verdict and for a new trial where there was plenary evidence to support defendant's convictions.

**4. Criminal Law § 141; Constitutional Law § 78 — habitual offender statute constitutional — type of review — life sentence upheld**

The North Carolina legislature acted within constitutional bounds in enacting legislation designed to identify habitual criminals and to authorize enhanced punishment. Under the Fair Sentencing Act, the proper review is not Eighth Amendment proportionality, but whether there has been "a showing of abuse of discretion, procedural conduct prejudicial to defendant, circumstances which manifest inherent unfairness or injustice, or conduct which offends the public sense of fair play." A life sentence given an habitual offender upon convictions of felonious breaking or entering and felonious larceny was upheld under facts showing defendant's propensity to steal and unlawfully possess firearms, his threat against law enforcement officers, and his attempted escape during trial. G.S. 14-1.1(a)(3), G.S. 14-7.1 *et seq.*, G.S. 15A-1340.1 *et seq.*

**5. Criminal Law § 141 — habitual offender — separate indictment proper — not necessary to re-empanel jury**

An habitual felon may be indicted as such in a separate bill, and the underlying indictment does not need to refer to his alleged status. Further-

State v. Todd

more, when the same jury considers both the principal felony and the question of defendant's recidivism, it is not necessary to re-empanel a jury once that jury has been properly empaneled pursuant to G.S. 15A-1216. G.S. 14-7.3, G.S. 15A-2000.

**6. Criminal Law §§ 138, 141— habitual felony—aggravating factor—sociopathic personality**

The trial court did not err by failing to grant defendant's motion to dismiss an habitual felon prosecution and by failing to grant his motions to set aside the verdict and for a new trial where the evidence clearly established that since 6 July 1967 defendant had been convicted or had pled guilty to three felony offenses, none of which were committed prior to defendant's eighteenth birthday. Furthermore, the additional finding in aggravation that defendant has an antisocial personality disorder was proper where the trial judge clearly enunciated the basis upon which this finding was made. Although a mental or emotional disorder may not be considered an aggravating factor, a finding that defendant is "a menace to other human beings and their possessions" is entirely proper where manifestations of that disorder involve little hope of rehabilitation coupled with serious antisocial and criminal behavior. G.S. 14-7.1.

Justice VAUGHN did not participate in the consideration or decision of this case.

DEFENDANT was tried before *Brannon, J.,* at the 18 July 1983 Session of Superior Court, BLADEN County, on charges of felonious breaking or entering and larceny, and being an habitual offender. After the jury returned verdicts of guilty on the charges of breaking or entering and larceny, the question of whether defendant was an habitual felon was submitted to the jury and answered in the affirmative. Pursuant to N.C.G.S. § 14-7.6 defendant was sentenced as a Class C felon and received a life sentence. From verdicts of guilty and a life sentence imposed thereon, defendant appeals as a matter of right.

Before this Court the defendant raises two evidentiary issues; challenges the sufficiency of the evidence; and contends that his conviction as an habitual offender violated his constitutional rights and was unsupported by the evidence. We find no error.

*Rufus L. Edmisten, Attorney General,* by *H. A. Cole, Special Deputy Attorney General,* for the State.

*Thomas M. Johnson, Attorney for defendant-appellant.*

MEYER, Justice.

At trial the State's evidence tended to show that on 12 February 1983, at approximately 7:00 p.m., Tom Rising returned to his Bladenboro home to discover that it had been broken into. A television set, a 12 gauge shotgun and a .22 Remington rifle were missing. The next day, Mr. Rising recovered the missing items which were concealed in briars in a wooded area approximately forty feet from his house.

Jerome Alton Stevens, the State's chief witness, testified that he, Gary Wilson, and William Wilson spent the afternoon of 12 February with the defendant. Stevens had agreed to drive the defendant from Whiteville to Bladenboro. Stevens testified that late in the afternoon, after visiting a friend of Gary Wilson's, the defendant directed Stevens to an area located beyond the intersection of Highway 211. Defendant instructed Stevens to stop the car. Defendant and Gary Wilson then left and went into the woods. After four or five minutes, Stevens heard gunshots. When the defendant returned to the car, he stated that he had broken into a house, and had taken some guns and a TV set which he had left in the woods and for which he would return later. Mr. Rising's house was approximately one hundred and thirty yards from where Stevens had stopped his car. Stevens, the defendant and Gary Wilson then went to a poolroom after which they picked up William Wilson from a friend's trailer and returned to Whiteville.

Tim Rising testified that on 13 February, shortly after he had discovered his property in the woods behind his house, he saw a car stopped on the road approximately fifteen to twenty feet from where the TV and guns had been left. He watched the defendant leave the car and walk to within six feet of the items. Rising confronted the defendant and his brother, who was ostensibly checking the oil in the car. Rising told the pair that his house had been broken into and asked them to await the arrival of the sheriff. Defendant stated he would not get involved, threatened to beat Rising, and the two left immediately.

Defendant offered the testimony of his brother who stated that although he had no trouble starting his car or leaving the area after their encounter with Rising, he was in fact repairing a broken carburetor or alternator at the time they were confronted

by Rising. Randy Todd also testified that the defendant never left the car. Defendant's mother testified that defendant arrived at her home in Bladenboro at approximately 5:00 p.m. on 12 February and remained there until after dark.

Defendant testified that he had gone to Bladenboro with Jerome Stevens on 12 February and they had shot pool until close to 5:00 p.m. when Stevens had taken the defendant to his mother's house. Defendant denied knowing William Wilson and knew Gary Wilson "from him being in the jailhouse." He testified that neither Gary nor William Wilson were with him and Stevens on 12 February.

When asked by his attorney whether he had been cutting wood sometime prior to 12 February, defendant responded that he had a few scratches on his hand. From this it could be inferred that the scratch marks on defendant's hands and arms which were observed by a sheriff's deputy on 13 February, were wounds incurred from cutting wood rather than from attempting to hide a TV set and guns in the briars behind Tim Rising's house. Defendant denied any involvement in the breaking or entering or larceny. Defendant had been out of prison less than a month when these crimes occurred.

With respect to the State's case against the defendant as an habitual felon, the evidence disclosed the following: On 8 June 1977 defendant was convicted in Superior Court, Columbus County, of the felony offense of larceny of a firearm. On 14 May 1979 defendant was convicted in Superior Court, Caldwell County, of the felony offense of larceny of more than $200.00. On 21 November 1980 defendant was convicted in Superior Court, Scotland County, for the felony possession of a controlled substance. In addition, for sentencing purposes, there was evidence that defendant had been convicted of possession of a firearm by a felon; possession with intent to sell or deliver a controlled substance; simple possession of marijuana; carrying a concealed weapon; possession of diazepam; and damage to real property.

During the sentencing hearing, held pursuant to N.C.G.S. § 15A-1340.1 *et seq.*, the State introduced the testimony of Russell Brown to the effect that defendant suffers from an antisocial personality disorder described as sociopathic. Crime is

usually a predominant characteristic of the disorder. Other characteristics are the tendency to focus on one's own needs and to disregard the needs of others; manipulative behavior; and an absence of significant relationships. Treatment of sociopathic personality disorders has not been successful.

The State also introduced the testimony of a Bladen County deputy sheriff who advised the Court that defendant, after the guilty verdict had been returned, stated that although he might be forty years old, when he got out of prison he was going to kill every law enforcement officer that he saw. The record discloses that the defendant, over his attorney's protestations, then interrupted the proceedings by stating "I called him a ----headed son-of-a bitch." The record also discloses the following entry made by the Court during the sentencing proceedings:

> Let the record show that these proceedings were interrupted by what the Court observed to be and was most obviously an attempt to escape by the defendant from the courtroom. The defendant was arrested and taken into custody before he could get out of the building, but he did get out of the courtroom. The Court took a recess at the point in time, in order to calm the situation down and give counsel for the defendant a chance to converse with any and all that he desired to converse to [sic], about that or anything else.

Defendant's evidence at the sentencing hearing consisted of the testimony of his mother and father both of whom were of the opinion that long-term incarceration would be detrimental to the defendant. Following defendant's attempted escape, the defense was permitted to reopen the evidence to present testimony of defendant's parents concerning defendant's good character and reputation in the community.

[1]  Defendant first contends that the trial court erred in admitting into evidence Jerome Stevens' testimony concerning defendant's statement that he had just broken into a house and taken a TV set and two guns. It is defendant's position, with no citation of authority, that because Stevens had pled guilty to the same charges for which defendant was being tried, and he was awaiting sentencing, his testimony, "unsupported by other evidence," was inadmissible.

State v. Todd

The record belies the defendant's contention that Stevens' testimony was unsupported by other evidence. Certainly defendant's presence within six feet of the stolen items the day after the theft, and the scratches on his arms support Stevens' version of the events. Furthermore, in *State v. Tilley*, 239 N.C. 245, 249, 79 S.E. 2d 473, 476 (1954) we stated that:

> It is well settled in this jurisdiction that although the jury should receive and act upon such testimony with caution, the unsupported testimony of an accomplice is sufficient to sustain a conviction if it satisfies the jury beyond a reasonable doubt of the guilt of the accused.

*Accord State v. Martin*, 309 N.C. 465, 308 S.E. 2d 277 (1983); *State v. Bindyke*, 288 N.C. 608, 220 S.E. 2d 521 (1975); *State v. Carey*, 285 N.C. 497, 206 S.E. 2d 213 (1974); *State v. McNair*, 272 N.C. 130, 157 S.E. 2d 660 (1967). This assignment of error is without merit.

[2] Defendant next contends that under the authority of *Miranda v. Arizona*, 384 U.S. 436, 16 L.Ed. 2d 694 (1966), his constitutional rights were violated by the admission of testimony concerning statements he made to a law enforcement officer. The officer testified that the day before he had been putting gas in his patrol car when the defendant had yelled down to him from his jail cell and indicated that he wanted to talk to the officer. The officer testified that after he had taken care of his car, he went into the jail to see the defendant. Prior to allowing the officer to testify further, the court conducted the following exchange with defense counsel in response to counsel's objection:

> MR. JOHNSON: Judge, I'm afraid we are getting into hearing evidence of the defendant —
>
> COURT: Pardon?
>
> MR. JOHNSON: —evidence about the defendant that has not been sworn. There is no testimony as to any giving of any constitutional rights in the statements that may be made on behalf of conversation with the defendant that may be damaging without the proper introduction of any Miranda warnings.
>
> COURT: Counsellor, you are not getting ready to tell me that when somebody is standing up in the jail cell yelling out the

window that the folks on the sidewalk have to look up and pull out their Miranda card and start going through that four — or five part written area?

MR. JOHNSON: No, sir. Your Honor, I would like for you to believe that though.

COURT: No . . . .

MR. JOHNSON: Yes, sir.

COURT: I take it though that is the basis of your objection, that as the officer sat there putting gas in his car, he didn't pull out his Miranda card and go through the litany with your client sitting up in the jail, right?

MR. JOHNSON: Thank you, your Honor.

COURT: . . . . On the basis given, the OBJECTION is OVER-RULED. Let the jury come on back. There being no interrogation. Miranda requires not only custody, but interrogation, too, or its functional equivalent, neither of which are apparent.

The officer then testified as follows:

> He wanted to know if I would see the D.A. about taking a plea on his case. That he had talked to his lawyer and told him to see the D.A., but the D.A. wouldn't talk to him about it. I told him, I said, "Well, Ricky, it's out of my hands. If your lawyer can't talk to the D.A., there is nothing I can say or do. You are just going to have to go on to court." And I left.

While all parties concede that defendant's statement to the officer was made while defendant was in custody, we agree with the State and the trial judge that the statement was not made as a result of interrogation. Both the circumstances surrounding the statement and the substance of the statement are clear indications that it was volunteered and a product of defendant's effort to enlist the assistance of the officer. This assignment of error is overruled.

[3] Defendant contends that the trial court erred in denying his motion to dismiss the breaking or entering and larceny charges. We disagree. There is plenary evidence to support defendant's

convictions on these charges. *See State v. Green*, 310 N.C. 466, 313 S.E. 2d 434 (1984). Likewise, we find nothing of record to support defendant's contention that the trial judge abused his discretion in denying defendant's motion to set aside the verdict and for a new trial. *See State v. Lindley*, 286 N.C. 255, 210 S.E. 2d 207 (1974). The assignment of error is overruled.

[4] Defendant next contends that North Carolina's habitual offender statute is unconstitutional. Defendant argues that prosecution under this statute denies him due process and equal protection of the law inasmuch as "it punishes him twice for acts for which he has already been punished." Defendant also contends that punishment as an habitual offender violates his eighth amendment right against cruel and unusual punishment.

Inasmuch as we have not specifically ruled on the constitutionality of our habitual felon statute, N.C.G.S. § 14-7.1 *et seq.*, we will first address defendant's due process and equal protection challenges. We begin by rejecting outright the suggestion that our legislature is constitutionally prohibited from enhancing punishment for habitual offenders as violations of constitutional strictures dealing with double jeopardy, ex post facto laws, cruel and unusual punishment, due process, equal protection, and privileges and immunities. These challenges have been addressed and rejected by the United States Supreme Court. *See Rummell v. Estelle*, 445 U.S. 263, 63 L.Ed. 2d 382 (1980); *Spencer v. Texas*, 385 U.S. 554, 17 L.Ed. 2d 606 (1967). Furthermore, in *State v. Allen*, 292 N.C. 431, 435, 233 S.E. 2d 585, 588 (1977), we noted that the procedures adopted by our legislature to deal with the problem of the multiple or habitual offender, "seems to be the fairest and least susceptible to constitutional attack:"

> "[T]he defendant has notice that he is to be charged as a recidivist before pleading to the present offense, eliminating the possibility that he will enter a guilty plea on the expectation that the maximum punishment he could receive would be that provided for in the statute defining the present crime. Moreover, while notice is given before pleading, only the allegation of the present crime is read and proved to the jury at the first trial, preventing any prejudice due to the introduction of evidence of prior convictions before the trier of guilt for the present offense." 40 N.Y.U. L. Rev. at 348.

We now hold that our legislature has acted within constitutionally permissible bounds in enacting legislation designed to identify habitual criminals and to authorize enhanced punishment as provided. The procedures set forth in N.C.G.S. § 14-7.1 to -7.6 likewise comport with the defendant's federal and state constitutional guarantees.

Relying on *Solem v. Helm,* --- U.S. ---, 77 L.Ed. 2d 637 (1983), defendant argues that the sentence he received violates his eighth amendment guarantee against cruel and unusual punishment. Defendant's reliance is misplaced. In *Solem,* a sharply divided Court held that defendant's life sentence with no opportunity for parole upon his conviction of a seventh nonviolent felony (uttering a "no account" check for $100.00), was disproportionate to the crime and therefore prohibited by the eighth amendment. The case was decided on its particular facts—facts which are clearly distinguishable from those in the present case.

N.C.G.S. § 14-7.6 provides that:

> *Sentencing of habitual felons.* When an habitual felon as defined in this Article shall commit any felony under the laws of the State of North Carolina, he must, upon conviction or plea of guilty under indictment as herein provided (except where the death penalty or a sentence of life imprisonment is imposed) be sentenced as a Class C felon. Notwithstanding any other provision of law, a person sentenced under this Article shall serve a term of not less than seven years in prison, excluding gain time granted under G.S. 148-13. A person sentenced under this Article shall receive a sentence of at least 14 years in the State's prison and shall be entitled to credit for good behavior under G.S. 15A-1340.7. The sentencing judge may not suspend the sentence and may not place the person sentenced on probation. Sentences imposed under this Article shall run consecutively with and shall commence at the expiration of any sentence being served by the person sentenced hereunder.

N.C.G.S. § 14-1.1(a)(3) provides that a "Class C felony shall be punishable by imprisonment up to 50 years, or by life imprisonment, or a fine, or both imprisonment and fine." N.C.G.S. § 15A-1340.1 *et seq.,* our Fair Sentencing Act, applies to the sentencing

of persons convicted of Class C felonies. Under that Act, the presumptive term for a Class C felony is 15 years.

As noted earlier, legislation which is designed to identify habitual criminals and which authorizes enhanced punishment has withstood eighth amendment challenges. *See generally Rummell v. Estelle*, 445 U.S. 263, 63 L.Ed. 2d 382; *Spencer v. Texas*, 385 U.S. 554, 17 L.Ed. 2d 606. Furthermore, defendant appears to be seeking a proportionality review of his sentence under the Fair Sentencing Act and such a review is not available under that statute. While we are cognizant of eighth amendment limitations, we have said that "[o]nly in exceedingly unusual non-capital cases will the sentences imposed be so grossly disproportionate as to violate the Eighth Amendment's proscription of cruel and unusual punishment." *State v. Ysaguire*, 309 N.C. 780, 786, 309 S.E. 2d 436, --- (1983). Defendant here has failed to present any facts which would provide the necessary basis for concluding that his sentence is "so grossly disproportionate" as to violate the eighth amendment.

Thus, although defendant's challenge to the severity of his sentence is couched in terms of an eighth amendment proportionality analysis, we believe that the proper review involves a determination, under the Fair Sentencing Act, of whether there has been "a showing of abuse of discretion, procedural conduct prejudicial to defendant, circumstances which manifest inherent unfairness or injustice, or conduct which offends the public sense of fair play." *State v. Ahearn*, 307 N.C. 584, 598, 300 S.E. 2d 689, 697 (1983). Indeed, we are confident that such a review provides fully adequate protections against alleged "disproportionate" punishments and necessarily involves focus on the considerations enunciated in *Solem v. Helms*.

Under the facts of this case, which necessarily include defendant's status as an habitual offender—a Class C felon—we uphold the life sentence imposed upon his convictions of felonious breaking or entering and felonious larceny. These facts include defendant's propensity to steal and unlawfully possess firearms, his threat against law enforcement officers, and his attempted escape during his trial. Our holding, of course, assumes that the evidence supports the trial judge's findings in aggravation and mitigation and that these findings are statutorily permissible. In

this regard, as noted below, our review discloses a technical error in one aggravating factor which we consider to be nonprejudicial.

[5]   In addition to the above constitutional challenges, defendant contends that the habitual felon indictment does not comply with N.C.G.S. § 14-7.3 in that the indictment for breaking or entering and larceny fails to refer to his alleged status as an habitual offender at the time of the commission of the crime. This issue has been resolved against the defendant in *State v. Allen*, 292 N.C. at 433-34, 233 S.E. 2d at 587 wherein we stated:

> Properly construed this act clearly contemplates that when one who has already attained the status of an habitual felon is indicted for the commission of another felony, that person may then be also indicted *in a separate bill* as being an habitual felon. It is likewise clear that the proceeding by which the state seeks to establish that defendant is an habitual felon is necessarily ancillary to a pending prosecution for the "principal," or substantive, felony. (Emphasis added.)

*See State v. Keyes*, 56 N.C. App. 75, 286 S.E. 2d 861 (1982); N.C. G.S. § 14-7.3.

Defendant also argues that the jury should have been re-empaneled prior to hearing the habitual felon case. The Court of Appeals addressed this issue in *State v. Keyes* and held that failure to re-empanel the jury, if error, was technical error and therefore not prejudicial. We hold that when, as contemplated by N.C.G.S. § 14-7.5, the same jury considers both the principal felony and the question of defendant's recidivism, it is not necessary to re-empanel a jury once that jury has been properly empaneled pursuant to N.C.G.S. § 15A-1216.

In *State v. Allen*, 292 N.C. at 435, 233 S.E. 2d at 588, we stated that "[b]eing an habitual felon is not a crime but is a status the attaining of which subjects a person thereafter convicted of a crime to an increased punishment for that crime." We therefore view a defendant's "trial" on the issue of whether defendant should be sentenced as an habitual offender analogous to the separate sentencing hearing conducted under N.C.G.S. § 15A-2000 to determine punishment for first-degree murder. That statute does not require a jury to be re-empaneled prior to hearing evidence in the sentence determination phase of the trial.

[6]  Finally, defendant contends that the trial court erred in failing to grant his motion to dismiss the habitual felon prosecution and in failing to grant his motions to set aside the verdict and for a new trial. This assignment of error is without merit. The evidence clearly established that since 6 July 1967 defendant had been convicted of or pled guilty to three felony offenses, none of which were committed prior to defendant's eighteenth birthday. N.C.G.S. § 14-7.1.

In reviewing the record in this case, we note that the trial judge found as an additional aggravating factor the following:

> 16. Additional written findings of factors in aggravation.
>
> The Court finds from the expert testimony of Dr. Russell Brown, Staff Forensic Psychiatrist, Dorothea Dix Hospital, that the defendant has what is referred to in the medical literature [as] anti-social personality disorder, also known as a sociopathic personality; and the Court incorporates by reference not only the doctor's testimony on the witness stand, all of which the Court finds to be true by at aleast [sic] a proponderence [sic] of the evidence, but also Section 301.70 as it appears in the standard handbook for psychiatric usage, a copy of which is in the court file as well as furnished to counsel for each side. From this the Court finds from the evidence in this case, taking it in its entirety, that the defendant is a menace to other human beings and their possessions as a direct result of his various social- [sic] and emotional problems as referred to above, and that his prognosis for change from the sociopathic personality is not good. That as a sociopath he will continue to commit crimes whenever the opportunity to do so presents itself. (For a similar result on a different set of facts/legal approach see *U.S. v. Berrigan*, 437 F 2d 750 (4th Cir. 1971).)
>
> A. M. Brannon /s

That the first sentence above is a factor in aggravation that the Defendant, Ricky Clyde Todd, is a sociopathic personality.

That the rest of the above paragraph is an explanation of the finding of a sociopathic personality and does not constitute an additional finding of aggravating [sic].

Although not raised as an issue, pursuant to Rule 2 of the North Carolina Rules of Appellate Procedure, we address the propriety of the finding in aggravation that defendant has an antisocial personality disorder referred to as a sociopathic personality, and hold that such a finding, standing alone, is improper. However, as the trial judge clearly enunciated the basis upon which this finding was made and we find that basis to be fully in accord with our holdings in previous cases, the error was in terminology rather than in reasoning.

A mental or emotional disorder, including a sociopathic personality, may not be considered as an aggravating factor. Where manifestations of that disorder involve, as the trial judge here observed, little hope of rehabilitation coupled with serious antisocial and criminal behavior, a finding that defendant is "a menace to other human beings and their possessions" is entirely proper. *See State v. Ahearn*, 307 N.C. 584, 300 S.E. 2d 689; *see also State v. Higson*, 310 N.C. 418, 312 S.E. 2d 437 (1984); *State v. Chatman*, 308 N.C. 169, 301 S.E. 2d 71 (1983).

No error.

Justice VAUGHN did not participate in the consideration or decision of this case.